UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| STEPHANOS KYRKANIDES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:19-CV-80-REW |
| | ) | |
| v. | ) | |
| | ) | OPINION AND ORDER |
| UNIVERSITY OF KENTUCKY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

The Court addresses two pending motions: Defendants' dismissal effort (DE #9) and

Plaintiff's request to again amend the Complaint (DE #10). Because the sought amendment as to

Plaintiff's only federal claim would be futile, the Court rejects the attempt and dismisses the claim.

Under the circumstances, as explained, the Court declines to exercise supplemental jurisdiction

over Plaintiff's asserted state claims and, thus, denies as moot the amendment request as to those

(here dismissed) claims.

I.      **Factual and Procedural Background**

Plaintiff Dr. Stephanos Kyrkanides—former Dean of the University of Kentucky College

of Dentistry ("UKCOD")—accuses UK and current UK Provost David A. Blackwell of

terminating[1] him in violation of several state laws and without affording him due process. DE #4

---

[1] The University did not terminate Plaintiff as a professor after ending his deanship; he remains a
tenured professor at the UKCOD. *See* DE #4 at ¶ 59 (alleging that Kyrkanides was "demoted");
*see generally* DE #10-2 at ¶¶ 69–81 (alleging the UKCOD's continued stifling of Kyrkanides's
ongoing UKCOD employment activities); *see also* DE #13 at 10 ("[I]t is also undisputed that he
was not removed from his role as 'professor' as it is undisputed that Kyrkanides remains a UK
professor."). The Court refers generally and interchangeably to the University or UKCOD.

(Amended Complaint).[2] Kyrkanides was appointed as Dean of the UKCOD on June 17, 2015 and served in the position until January 16, 2019. *Id.* at ¶¶ 1, 25. Per Kyrkanides's employment agreement, *see* DE #10-18,[3] the position "include[d] a faculty appointment as Professor, with tenure, in the Division of Orthodontics in the Department of Oral Health Science." *Id.* at 1. The agreement further provided that Kyrkanides would "serve at the discretion of the Provost for an initial period of six years." *Id.* Plaintiff indicated, via his signature on the document, that he accepted the appointment and understood its conditions, as outlined in the agreement. *Id.* at 2.

As a general matter, Kyrkanides avers—under state law theories—that the College terminated him in retaliation for three activities: (1) reporting and seeking to discontinue faculty misuse of funds; (2) exploring employee theft of harvested gold crowns; and (3) supporting investigation into perceived illegal discrimination at the UKCOD. *See* DE #4 at ¶¶ 9, 33, 44, 54. As to the first class of allegations, Plaintiff asserts that UK Healthcare's Associate General Counsel Cliff Iler confirmed to him that the UKCOD was paying faculty salary supplements out of compliance with University regulations. *Id.* at ¶ 11–12. Kyrkanides discovered that, as a result, the UKCOD incurred a substantial deficit. *Id.* at ¶ 13. He alleges that his subsequent attempts to address the salary supplement issue with faculty and administrators drew hostility. He claims lack

---

[2] In reciting the facts, the Court references the currently operative Amended Complaint (DE #4). The DE #4 factual allegations are not materially different from those in Plaintiff's DE #10-2 proposed Second Amended Complaint, particularly as related to the federal due process claim.

[3] Curiously, Plaintiff did not attach the employment agreement (a document integral to his claims) to either the initial Complaint or operative Amended Complaint. He does append it to the proposed Second Amended Complaint. DE #10-18. The Court, though ultimately rejecting the amendment effort, considers the employment agreement in evaluating amendment propriety and thus includes its content in outlining the case's factual landscape. *See Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) ("Documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss."); *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (permitting consideration, as part of the dismissal inquiry, of exhibits attached to the Complaint and other pleadings, "so long as they are referred to in the Complaint and are central to the claims contained therein"). Letter content is not in dispute.

of support from the Provost. *Id.* at ¶¶ 14–24. Kyrkanides maintains that he otherwise consistently received praise from the UKCOD, including Provost Blackwell, for his job performance. Plaintiff thus attributes the abrupt January 2019 termination (at least in part) to his unpopular fund misuse correction efforts. *Id.* at ¶¶ 26–31.

The second alleged demotion basis stems from Kyrkanides's concern that UKCOD clinical employees were "stealing gold crowns and either selling them on the secondary market to purchase gifts for their own families, or converting them to gold coins and taking them home." *Id.* at ¶ 34. Plaintiff, considering this violative of UKCOD rules or law, sought to stop the theft but received little administrative support in doing so. *Id.* He alleges that Human Resources ultimately informed him (on January 15, 2019) that prevalence of the theft made it impossible to address and, despite reaching out to the Provost for assistance, he encountered refusal. *Id.* at ¶ 36. Kyrkanides, (apparently based on this interaction's temporal proximity to his January 16 termination) surmises that the UKCOD retaliated against him for reporting the theft issues.

Finally, Plaintiff contends that the demotion in part resulted from his efforts to address alleged UKCOD discrimination against minority students. After "underrepresented minority students in the College of Dentistry and a recent graduate of the College of Dentistry complained to the Plaintiff about discriminatory experiences in their interactions with some dental faculty members[,]" Kyrkanides sought Blackwell's support. *Id.* at ¶ 44–47. When he did not receive it, Plaintiff endeavored to address the perceived discrimination issues without Provost support. *Id.* at ¶ 52. Upon backlash from Blackwell, Kyrkanides filed a September 2018 formal complaint against UK "alleging that he was being harassed by Provost Blackwell[.]" *Id.* at ¶ 54. UK's investigation into the harassment matter concluded, per Kyrkanides, on January 15, 2019. *Id.* Plaintiff claims

that his involvement in the three investigations prompted retaliatory demotion on January 16, 2019. *Id.* at ¶¶ 55–56.

Plaintiff initiated this case in March 2019,[4] *see* DE #1, and soon amended the Complaint as of right per Rule 15, *see* DE #4. The Amended Complaint includes three state law claims (retaliation based on the fund misuse efforts, retaliation based on the crown theft report, and retaliation based on Kyrkanides's involvement in the discrimination and harassment investigations), as well as one federal Fourteenth Amendment due process claim. Plaintiff, as grounds for the due process claim, avers that the UKCOD deprived him of a protected property interest in the deanship without affording him adequate process. *Id.* at ¶¶ 58–59. Kyrkanides also alleges that, by demoting him, the University unlawfully deprived him of a liberty interest in reputation. *See id.* at ¶ 60 ("In addition, Plaintiff's good name, honor, and integrity has been harmed."). Kyrkanides seeks reinstatement as Dean and an order enjoining further retaliation against him. *Id.* at 16, ¶¶ (a)–(b). He further demands a court order requiring the "state" to investigate certain perceived regulatory violations. *Id.* at 16, ¶ (c). Lastly, as monetary relief, Plaintiff pursues lost wages, benefits, and grant funds, $7.5 million for embarrassment and humiliation, and $10 million in punitive damages. *Id.* at 16, ¶¶ (d)–(k).

In April 2019, Plaintiff filed a Second Amended Complaint, without seeking leave to do so, DE #7, and the Court struck the Rule 15-violative filing, *see* DE #8. Defendants moved to dismiss (all claims) roughly a month after these events. DE #9. Plaintiff then sought leave to amend the Complaint a second time five days later. DE #10. The proposed Second Amended Complaint

---

[4] Kyrkanides filed the original Complaint in federal Court and alleged federal question jurisdiction. *See* DE #1 at ¶ 6. However, in a glaring omission, that pleading did not actually contain any federal claim. Plaintiff quickly endeavored to correct this in the Amended Complaint by tacking Count IV, the due process claim, onto the end of the prior state substantive allegations. The sequence is a good litmus for the centrality, if not vibrancy, of the federal theory.

(DE #10-2) adds (only slight) detail to some of Plaintiff's allegations, injects two new parties (UK General Counsel William Thro and UK Chief of Staff Bill Swinford), and alleges a new state claim for breach of Plaintiff's employment contract. Both the dismissal motion and amendment request are fully briefed and ripe for decision. *See* DE ##12, 13, 14, 15.

## II.     Amendment and Dismissal Standards

Rule 15 permits pleading amendment once as a matter of course, subject to certain limitations. Fed. R. Civ. P. 15(a)(1). Kyrkanides took advantage of that opportunity here. "In all other cases," though, "a party may amend its pleading only with the opposing party's written consent or the court's leave." *Id.* at (a)(2). In such instances, "[t]he court should freely give leave when justice so requires." *Id.* Rule 15 thus sets a relatively low amendment justification bar. *See Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986) (noting Rule 15's "liberality in allowing amendments to a complaint"); *see also Janikowski v. Bendix Corp.*, 823 F.2d 945, 951 (6th Cir. 1987) (quoting *Teft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982)) ("The thrust of the provision 'is to reinforce the principle that cases should be tried on the merits rather than on the technicalities of pleadings.'").

The Rule's liberality, though, is bounded; some considerations weighing against amendment include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment[.]" *Leary v. Daeschner*, 349 F.3d 888, 905 (6th Cir. 2003) (quoting *Foman v. Davis*, 83 S. Ct. 227, 230 (1962)). Ultimately, "leave to amend remains within the sound discretion of the trial court[.]" *Id.* "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (citing *Thiokol*

*Corp. v. Department of Treasury, State of Michigan, Revenue Div.*, 987 F.2d 376, 382–83 (6th Cir. 1993)); *accord Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010); *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 782 (6th Cir. 2015). This case thus sits at the intersection of Rules 15 and 12(b)(6).

Dismissal is appropriate to the extent a complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). In deciding a Rule 12 motion, "the complaint is viewed in the light most favorable to plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs." *Nwanguma v. Trump*, 903 F.3d 604, 607 (6th Cir. 2018) (citing *Bassett,* 528 F.3d at 430). However, the Court is not required to accept as true "a legal conclusion couched as a factual allegation[.]" *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Rule 12(b)(6) survival "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Id.* Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

Hinging on Rule 8's minimal standards, *Twombly* and *Iqbal* require a plaintiff to "plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). The factual allegations collectively must "raise a right to relief above the speculative level[,]" *id.*, and "state a claim that is plausible on its face, *i.e.*, the court must be able to draw a 'reasonable inference that the defendant is liable for the misconduct alleged.'" *Nwanguma*, 903 F.3d at 607 (quoting *Iqbal*, 129 S. Ct. at 1949 (citation omitted)). This "plausibility standard" does not require a showing that success on the claims is *probable*, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at

1949. Where plaintiffs state "simply, concisely, and directly events that . . . entitled them to damages," the rules require "no more to stave off threshold dismissal for want of an adequate statement[.]" *Johnson*, 135 S. Ct. at 347; *see also El-Hallani v. Huntington Nat. Bank*, 623 F. App'x 730, 739 (6th Cir. 2015) ("Although *Twombly* and *Iqbal* have raised the bar for pleading, it is still low.").

Unadorned, naked assertions warrant no presumption of truth and are not well-pleaded facts in the plausibility analysis. *Iqbal*, 129 S. Ct. at 1949. "Plausibility is a context-specific inquiry," *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011), "requiring the reviewing court to draw on its experience and common sense[,]" *Iqbal*, 129 S. Ct. at 1950. In deciding a dismissal motion attacking pleading adequacy, courts must assess "the facial sufficiency of the complaint . . . without resort to matters outside the pleadings[,]" with the limited exception of "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citations omitted).

### III.     Amendment Futility

Kyrkanides pleads two versions of a Fourteenth Amendment procedural due process claim—one hinging on a purported contract-based property interest in the UKCOD deanship, and the other based on an asserted reputational liberty interest.[5] "Procedural due process requires that

---

[5] Plaintiff proceeds with the federal constitutional claims via 42 U.S.C. § 1983. DE #4 at ¶ 6; DE #10-2 at ¶ 8.  As Defendant UK—a state-funded university—is not a "person" for § 1983 purposes, it is immune from suit under the Eleventh Amendment, and Kyrkanides's due process claims against it fail. *See, e.g.*, *Underfer v. Univ. of Toledo*, 36 F. App'x 831, 834 (6th Cir. 2002) (citing *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299, 304 (6th Cir. 1984)) ("Because the Eleventh Amendment bars suits against state entities in federal court . . . this Court has held that public-funded universities are not considered 'persons' under § 1983 and are immune from actions

a person be afforded notice and a right to be heard before the state deprives him of a property or liberty interest." *Jahn v. Farnsworth*, 617 F. App'x 453, 459 (6th Cir. 2015) (citing *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005)). "In reviewing an alleged violation of procedural due process, a court must first determine whether the party has identified a protected liberty or property interest, and then turn to whether the deprivation of that interest contravened notions of due process." *Id.* (citing *Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002)).

First, Kyrkanides's liberty-based due process allegations—as presented in the proposed Second Amended Complaint—patently fail to state a viable due process claim. Though "[a] person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment[,]" *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (citation omitted), the Second Amended Complaint's meager reputation-related allegations fail to raise any non-speculative right to relief, *see Johnson*, 135 S. Ct. at 347. A liberty-based due process claim (procedural or substantive) requires, at minimum (at this stage), *some* allegation that the accused party publicly disclosed stigmatizing statements, in conjunction with deprivation of a tangible interest. *See, e.g.*, *Quinn*, 293 F.3d at 320 ("A name-clearing hearing is

---

under this section.") (internal citation omitted). Official-capacity claims seeking money damages against individuals face the same fate. *See Moncier v. Jones*, 557 F. App'x 407, 409 (6th Cir. 2014) ("[T]he Eleventh Amendment bars official-capacity claims for damages against state officials."). In order to overcome the Eleventh Amendment bar as to specific actors, "a plaintiff must either seek injunctive relief against a state official in his official capacity or seek monetary relief against a state official acting in his individual capacity." *Underfer*, 36 F. App'x at 834. The Court construes the Second Amended Complaint as suing the three University officials—Provost Blackwell, General Counsel Thro, and Chief of Staff Swinford—in both their individual and official capacities (despite the proposed caption's lack of clarity). *See* DE #10-2 at 1 (identifying each actor "in his Official and Individual Capacity"). As discussed *infra*, the constitutional claims fail for reasons independent of the relief sought. Additionally, though Plaintiff does not expressly so state, the Court (given the Amended Complaint's and proposed Second Amended Complaint's allegations, together with the parties' briefing angles) considers Plaintiff's asserted due process claims only procedural, rather than substantive. *See, e.g.*, DE #12 (Plaintiff's Response to Defendants' Motion to Dismiss) at 3 (explicitly discussing procedural due process).

required only if the employer creates a false and defamatory impression about a particular employee in connection with his termination."); *id.* (reciting the claim elements, among them that "stigmatizing statements must be made in conjunction with the plaintiff's termination from employment" and "the stigmatizing statements or charges must be made public") (citation omitted); *Mertik v. Blalock*, 983 F.2d 1353, 1362 (6th Cir. 1993) ("[W]hen a plaintiff alleges the loss, infringement or denial of a government right or benefit previously enjoyed by him, *coupled with communications by government officials having a stigmatizing effect*, a claim for deprivation of liberty without due process of law will lie.") (emphasis added); *Stringfield v. Graham*, 212 F. App'x 530, 539 (6th Cir. 2007) ("[A] moral stigma such as immorality or dishonesty is required to show a deprivation of liberty.") (citation omitted); *Parrino v. Price*, 869 F.3d 392, 398 (6th Cir. 2017) ("To establish a deprivation of a protected liberty interest in the employment context, [a plaintiff] must demonstrate stigmatizing governmental action which so negatively affects his . . . reputation that it effectively forecloses the opportunity to practice a chosen profession . . . [The plaintiff] must also have allege[d] in his . . . complaint that the stigmatizing information was publicly disclosed.") (internal quotation marks and citation omitted); *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir. 1996) ("A plaintiff must also allege in his or her complaint that the stigmatizing information was publicly disclosed.").

Plaintiff includes no such allegations in the Second Amended Complaint.[6] The sole averments regarding purported reputational harm associated with Kyrkanides's termination as Dean are: (1) a conclusory statement that "Plaintiff has lost his good name, honor, and integrity has been harmed[,]" DE #10-2 at ¶ 70; and (2) vague references to Plaintiff being the "only Dean in the History of University of Kentucky who was removed without cause[,]" *id.* at ¶ 71; *see also*

---

[6] The Amended Complaint was barer still and less adequate. *See* DE # 4 at ¶ 60.

*id.* at ¶ 75 ("That no other Dean in the History of the University of Kentucky has been refused, or removed without a summative review, when appropriate or requested."). Nowhere does Plaintiff allege that UK, or any of the identified actors in this case, made *any* negative, stigmatizing, or otherwise reputation-harming statements attendant to the demotion. Nor, for that matter, does Kyrkanides allege that Blackwell, Thro, or Swinford made any public statements at all regarding the deanship termination. Plaintiff—offering, in substance, only a one-line nod to a potential liberty-based claim—includes no facts demonstrating the substantive plausibility of reputation-based liberty deprivation.[7] The Court rejects "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation[.]" *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *Id.* at 995–96. Plaintiff's conclusory, barebones reputation-harm statement warrants no truth presumption in the Rule 12(b)(6) analysis, *Iqbal*, 129 S. Ct. at 1949, and, given the utter lack of supporting facts alleged, the claim falls far below the required pleading standard.

Plaintiff's property deprivation claim is closer, but ultimately fares no better. "Property interests protected by the Constitution stem from an independent source, such as state law, and are not created by the Constitution itself." *Nunn v. Lynch*, 113 F. App'x 55, 58 (6th Cir. 2004) (quoting *Sharp v. Lindsey*, 285 F.3d 479, 487 (6th Cir. 2002) (citation omitted)). Such a right may, as

---

[7] Plaintiff's brief reference to the liberty claim in his response to Defendants' dismissal effort adds no substantive value. Kyrkanides simply states that he has applied for several deanships but been denied, and that these places have inquired about the UK events. DE #12 at 10. If anything, this argument highlights the absence of any alleged publicly disseminated, stigmatizing statements—indeed, if UK had publicized harmful information about Kyrkanides in conjunction with his deanship termination—and Kyrkanides's employment reputation were so harmed as a result—prospective employers likely would not be asking "what happen[ed] at the University of Kentucky[.]" *Id.* Regardless, this perfunctory argument in briefing does nothing to bolster the Second Amended Complaint's insufficient allegations.

Kyrkanides asserts here, be rooted in an employment contract. *See, e.g.*, *Sharp v. Lindsey*, 285 F.3d 479, 487 (6th Cir. 2002). "Government employment amounts to a protected property interest when the employee is 'entitled' to continued employment." *Nunn*, 113 F. App'x at 58–59 (quoting *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997)). Any "protected property interest is defined by the terms of the state document creating" it. *Kelley v. Shelby Cty. Bd. of Educ.*, 751 F. App'x 650, 657 (6th Cir. 2018). In analyzing whether an employment agreement yields a protected property interest, "[t]he essential inquiry is whether there exists a mutually explicit understanding[ ] that support[s] [the plaintiff's] claim of entitlement." *Crosby v. Univ. of Kentucky*, 863 F.3d 545, 552 (6th Cir. 2017) (citation omitted). Kyrkanides thus "must demonstrate a legitimate claim of entitlement to his position; a mere unilateral expectation or abstract need to continue undisturbed in his post is not enough." *Id.* (citation omitted).

Though "Sixth Circuit caselaw establishes that tenured university professors [do] not have a constitutionally protected property interest in administrative posts[,]" *id.* at 552–53, a protected interest could arise "where the administrative position itself is a tenure-track appointment or where a professor has received an express guarantee that he will not be removed from the position except for cause[,]" *id.* at 553. Neither Kyrkanides's employment agreement, nor the cited UK regulations or Kentucky statutes, satisfy these qualifications; nor does the employment agreement demonstrate any mutually explicit understanding as to continued deanship entitlement, as a general matter. Despite Plaintiff's assertion (ostensibly based on the DE #10-18 signed offer letter) that "Defendants knew or should have known that the Plaintiff was not an 'at will employee[,]'" DE #10-2 at ¶ 71, he has not adequately alleged, or shown, that the contract included any pre-dismissal condition. "Kentucky contract law rebuttably presumes that employment agreements are 'at will'—that is, an employee 'is subject to dismissal at any time and without cause' absent

11

contractual language that 'specifically manifest[s] [the parties'] intention to condition termination only according to express terms.'" *Crosby*, 863 F.3d at 553 (quoting *Bailey*, 106 F.3d at 141 (citation omitted)). And "at-will employees have no constitutionally protected property interest in their employment absent an express contrary manifestation from their employer." *Id.*

Per Kyrkanides's DE #10-2 allegations, as illuminated by the referenced employment contract he attaches (DE #10-18), the deanship (an administrative post within the UKCOD)[8] is not itself a tenured position,[9] and there is no indication that Plaintiff's removal from the post was to be conditioned upon any terms, express or otherwise. There is no mention of dismissal conditions or any for-cause dismissal predicate. To the contrary, the agreement states that "[a]s dean, [Kyrkanides] [would] serve *at the discretion of the Provost* for an initial period of six years[,]" during which time he would be subject to intermittent reviews, as there described. DE #10-18 at 1 (emphasis added). The agreement's language—far from "manifest[ing] [an] intention to condition termination only according to express terms"—clearly notes that Kyrkanides's deanship would be subject to continued Provost discretion (without any stated limitation), on an ongoing basis during the initial six-year employment period. *See Crosby*, 863 F.3d at 553. Though Plaintiff emphasizes the "period of six years" language to argue that the contract sets a fixed employment term, the remainder of the agreement—indeed, the rest of the sentence—conveys precisely the opposite impression. The contract, as a whole, does not plausibly suggest any "express guarantee that

---

[8] Indeed, the employment agreement makes clear the administrative nature of the deanship. *See* DE #10-18 at 1 (noting that, as dean, Kyrkanides would receive "an annual salary of $350,000 and benefits consistent with University policy *for administrative appointments*") (emphasis added).
[9] Though Kyrkanides, in one place, alleges that "the Board of Trustee[s] gave the Plaintiff tenure on December 15, 2015[,]" DE #10-2 ¶ 74, he does not explain this assertion, and the employment agreement clearly denotes tenure as relating only to his role as a UK professor, not as a dean; the agreement mentions tenure only in connection with the faculty appointment—not the administrative deanship role. *See* DE #10-18 at 1 ("Your position will include a faculty appointment as Professor, with tenure[.]").

12

[Kyrkanides] will not be removed from the position except for cause[.]" *Id.* At bottom, it simply

provides no "express contrary manifestation" plausibly rebutting Kyrkanides's presumptive at-will

employment status. *Id.* Plaintiff—relying primarily on the employment agreement—has not

adequately alleged a property interest in continued employment as the UKCOD dean.[10]

The Court has carefully surveyed the offer letter, the incorporated regulation, and the other

statutes and administrative guidance Kyrkanides cites. Plaintiff undoubtedly has job protection in

his professorship, as the letter conveys. He retains his faculty position. As to the deanship, the

parties agreed that the term would be an initial six years but that Kyrkanides would, as dean and

during that term, "serve at the discretion of the Provost[.]" DE #10-18 at 1. Service at an

employer's discretion is synonymous with "at will" employment. *See, e.,g.*, *Joelson v. United*

*States*, 86 F.3d 1413, 1421 (6th Cir. 1996) (rejecting claimed property interest in bankruptcy

trusteeship, for due process purposes, where trustees served only at the discretion of the U.S.

Trustee and had no "affirmative right to continued membership on the panel"); *accord Brooks v.*

---

[10] Nor do the other authorities Kyrkanides cites create any property right for Fourteenth Amendment purposes. KRS § 164.230 requires cause dismissal *only* for "[a] president, professor or teacher[.]" The statute, by its terms, does not apply to administrative positions; and, as the parties here agree, Kyrkanides remains a tenured UKCOD professor. Likewise, UK Administrative Regulation 3:16 ("AR 3:16") does not mention dismissal procedure or conditions. *See* University of Kentucky Regulations, Administrative Regulation 3:16, *available at* https://www.uky.edu/regs/sites/www.uky.edu.regs/files/files/ar/AR3-16.pdf. AR 3:16 merely describes the review processes, and criteria, for deans and other administrative officials. The regulation contains no indication, much less an express guarantee, that UK requires any specific cause or condition to dismiss any of the covered employees. And, critically, Kyrkanides does not plausibly explain in his proposed Second Amended Complaint (or any prior iteration) how either the regulation, or the cited KRS provision, creates any such mutual expectation of employment entitlement. Procedural mechanisms alone do not create substantive job protection. *See Mulvenon v. Greenwood*, 643 F.3d 653, 658 (8th Cir. 2011) ("[T]he existence of procedures governing one's continued employment cannot, standing alone, create a property right to continued employment."); *Cleveland Bd. of Educ. v. Loudermill*, 105 S. Ct. 1487, 1493 (1985) ("'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty."); *Chandler v. Vill. of Chagrin Falls*, 296 F. App'x 463, 469 (6th Cir. 2008) ("This Court has held that processes mandated by municipal ordinances or state law are insufficient to establish a property interest.").

*United States*, 127 F.3d 1192, 1194 (9th Cir. 1997); *Garvie v. Jackson*, 845 F.2d 647, 651 (6th Cir. 1988) (finding no "legitimate claim of entitlement to [a] position as Department Head" where the position was "renewed at the discretion of the Dean" and "all department heads in the University serve[d] at the pleasure of the Chancellor"); *Bracken v. Collica*, 94 F. App'x 265, 267 (6th Cir. 2004) (quoting *Chilingirian v. Boris*, 882 F.2d 200, 203 (6th Cir. 1989)) ("[A] public employee does not have a property interest in continued employment when his position is held at the will and pleasure of his superiors and when he has not been promised that he will only be terminated for good cause."); *Granger v. Bd. of Trustees of Univ. of Louisville*, 861 F.2d 720 (6th Cir. 1988) (Table), 1988 WL 115591, at *1 (affirming dismissal of administrator's property-based due process claim, where the plaintiff served "at the pleasure of the Board of Trustees"); *Cf. Blazy v. Jefferson Cty. Reg'l Planning Comm'n*, 438 F. App'x 408, 412 (6th Cir. 2011) (noting that, in Ohio, unclassified civil servants "'serve[] at the pleasure of the Commission' and thus [are] not entitled to [ ] statutorily-based due process protections").

The other materials Plaintiff gathers simply define mechanics for review and allocate protections to particular (non-administrative) classes of University employees. *Crosby* dispatched a series of due process arguments built on the same statutory and regulatory structure. *See* 863 F.3d at 553. Indeed, that case rejected the idea that a defined temporal term, for an administrative role, varied the default at-will relationship under Kentucky law. *See id.* (rejecting the plaintiff's argument that "his role as Chair constituted fixed-term employment and, as such, he could be terminated only for cause"). Kyrkanides, making like arguments, cites to nothing that constrains the University's power to regulate and remove persons in administration, including the dean of the UKCOD. "His [deanship] was not a tenure-track appointment, nor did he receive any express

14

guarantee that he would not be removed from the position except for cause." *Id.* at 554. The complaint versions, both filed and offered, do not suffice.

In sum, Plaintiff's asserted property and liberty deprivation allegations—as presented in Plaintiff's proposed amendment—do not demonstrate plausible entitlement to relief. The proposed Second Amended Complaint, considered together with the central and attached employment agreement, omits facts essential to both due process claim subsets, as discussed. The largely conclusory allegations are insufficient to "raise a right to relief above the speculative level" or create any reasonable inference that Defendants have violated the Fourteenth Amendment. *Nwanguma*, 903 F.3d at 607. Accordingly, because the due process claims as amended would be unable to survive a Rule 12(b)(6) dismissal motion, the sought amendment is futile and the federal due process claims properly dismissed.[11]

## IV.    Supplemental Jurisdiction

Having found the only federal claims deficient under Rule 12, the Court declines to exercise supplemental jurisdiction over Kyrkanides's pendent state law claims. Though the Court, per 28 U.S.C. § 1367(a), may exercise supplemental jurisdiction over the Kentucky claims given their factual commonality, it is not required to do so. After a "district court has dismissed all claims over which it has original jurisdiction" the exercise of supplemental jurisdiction is not mandatory.

---

[11] Again, the analysis is the same as to the less detailed and less particular Amended Complaint. The Second Amended Complaint would fail, as does the Amended Complaint. Both require focus on stating a valid due process claim; both pleadings fall short of the federal court threshold. Further, to the extent Plaintiff attempts to hinge a property deprivation claim on lost deanship-associated grants (*see* DE #10-2 at ¶ 76), he offers no specific factual allegations plausibly indicating a due process interest in grant funding. Kyrkanides does not claim any personal ownership in or independent entitlement to deanship-tied grants or grant funding. He provides no details as to grant language or structure; nor does he point to any separate grant-specific contractual agreement. Plaintiff's conclusory contention in this regard is inadequate to demonstrate relief entitlement, under the due process rubric.

28 U.S.C. § 1367(c). The Court's discretion in this area is broad, but "bounded by constitutional and prudential limits on the use of federal judicial power." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). The Court, in exercising its discretion on this topic, considers "judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 108 S. Ct. 614, 619 (1988).

Where all federal claims have been dismissed pretrial, "the balance of considerations usually will point to dismissing" or remanding state claims. *Musson Theatrical*, 89 F.3d at 1254–55. Indeed, "a 12(b)(6) dismissal of the touchstone claims" creates "a strong presumption in favor of dismissing supplemental claims." *Id.* at 1255. In other words, a pleading-stage rejection of federal claims "precludes the exercise of supplemental jurisdiction over any remaining claims" absent "unusual circumstances." *Id.*; *see also Brown v. Burch, Porter & Johnson, PLLC*, No. 15-6242, 2016 WL 9448027, at \*3 (6th Cir. Nov. 21, 2016) ("Such [unusual] circumstances include the dismissal of federal claims on the eve of trial, following years of preparation."). "A federal court that has dismissed a plaintiff's federal-law claims should ordinarily not reach the plaintiff's state law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006); *accord Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir.2007) ("[R]esidual supplemental jurisdiction should be exercised sparingly, to avoid needless decisions of state law.").

The Court sees nothing, on this record, to overcome the weighty presumption against exercising supplemental jurisdiction in this scenario. This case is in its infancy. The docket consists merely of the Complaint and associated amendments, the dismissal briefing, and the amendment effort. No discovery has yet occurred, and no case schedule is in place. Further, the state law claims require interpretation and application of several Kentucky statutes. And, the briefing in this Court has focused largely on the federal due process issues, rather than the state

claims. *See, e.g.*, DE #9-1 (Memorandum in Support of Defendants' Motion to Dismiss) (discussing only the due process claims); DE #12 (Plaintiff's Response) (same). Given the nascency, the relative lack of resources expended to date on analyzing the asserted state claims (and, correspondingly, the comparative lack of briefing before the Court on those issues), and the state statutory territory the claims cover, the "strong" presumption against jurisdictional exercise persuades the Court that doing so would be imprudent under these circumstances.[12] The case ends where it started in the prime Complaint: This is a state-law whistleblower or wrongful discharge action, with no federal hook. The Court lets the case play out where it belongs, in the courts of the Commonwealth.

## V.     Conclusion

Accordingly, the Court **ORDERS** as follows:

1. The Court, in its discretion, **DENIES** the DE #10 amendment request as futile, for the reasons and to the extent here described;

2. The Court **GRANTS** DE #9, in substantial part, and **DISMISSES** the asserted federal due process claims **with prejudice**; and

3. The Court, declining to exercise supplemental jurisdiction for the reasons discussed, **DISMISSES** the remaining state law claims **without prejudice**.

A corresponding Judgment follows.

This the 19th day of November, 2019.



Signed By:

*Robert E. Wier*

**United States District Judge**

---

[12] Notably, Plaintiff has not addressed or explained why, in the event of federal claim dismissal, the Court *should* exercise supplemental jurisdiction over the state claims at this stage.